UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff(s),<br><br>v.<br><br>STEVEN GRIMM, et al.,<br><br>Defendant(s). | Case No. 2:08-CR-64 JCM (GWF)<br><br>**ORDER** |

Presently before the court is Eve Mazzarella's ("defendant") motion for compassionate release. (ECF No. 778). The United States of America ("the government") filed a response (ECF No. 782), to which defendant replied (ECF No. 785).

Also before the court is the government's motion to file exhibtis 4 and 5 under seal. (ECF No. 783).

**I.     Background**

As relevant to this motion, Judge Hunt sentenced defendant to 14 years' incarceration on March 30, 2012, for various charges related to a mortgage fraud scheme. (ECF Nos. 428; 439). While defendant has been incarcerated, the novel strain of coronavirus and COVID-19, the resultant respiratory disease, has run rampant throughout the country and the world. While the court need not reiterate the well-known effects COVID-19 has had on day-to-day life, certain populations are particularly at risk of "severe illness" from the virus: the elderly, asthmatic, immunodeficient, and people with HIV. *See* Center for Disease Control, *People Who Are at Higher Risk for Severe Illness,* (May 14, 2020).[1]

---

[1] Available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

**James C. Mahan**
**U.S. District Judge**

The CDC's list of at-risk persons has expanded, and new studies on COVID-19 vis-à-vis comorbidities continue to be promulgated. *Id.*; *see also*, *e.g.,* Xianxian Zhao, et al., *Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis* (March 20, 2020);[2] Safiya Richardson, et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area* (April 22, 2020).[3]

Defendant moves this court for compassionate release, arguing that her underlying "immunologic conditions" compromise her immune system and make her more susceptible to COVID-19. (ECF No. 778 at 11). While the government acknowledges that defendant has exhausted her administrative remedies, as required by the First Step Act, 18 U.S.C. § 3582(c)(1)(A), it argues that the court should deny the motion because her conditions are overstated and do not substantially diminish her ability to provide self-care within the environment of a correctional facility. (ECF No. 782 at 12–14).

**II.  Legal Standard**

"Even though courts ordinarily have the inherent authority to reconsider its prior orders, such authority does not exist when there is an "express rule to the contrary." *United States v. Barragan-Mendoza*, 174 F.3d 1024, 1028 (9th Cir. 1999). One such contrary rule exists in the sentencing context: "A court generally may not correct or modify a prison sentence once it has been imposed." *United States v. Penna*, 319 F.3d 509, 511 (9th Cir. 2003) (citing 18 U.S.C. § 3582(c)). Thus, the court may modify a sentence only when expressly authorized by statute.

The court is expressly authorized to modify a sentence under the compassionate release provision of 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018). 18 U.S.C. § 3582(c)(1)(A). However, courts may consider compassionate release only "upon motion of the Director of the Bureau of Prisons . . . ." *Id.* If a defendant wants to file such a motion with the court, he must fully exhaust his administrative

---

[2] Available at https://www.medrxiv.org/content/10.1101/2020.03.17.20037572v1.full.pdf.

[3] Available at https://jamanetwork.com/journals/jama/fullarticle/2765184.

James C. Mahan
U.S. District Judge

- 2 -

remedies before doing so. *Id.* Since the enactment of the First Step Act, a defendant may file a compassionate-release motion if his application to the BOP goes unanswered for thirty days. *Id.*

To be eligible for compassionate release, a defendant must demonstrate: (1) the existence of extraordinary and compelling reasons, and (2) that he is not a danger to the community. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. Under USSG § 1B1.13, "extraordinary and compelling reasons" include, amongst other things, terminal illnesses and medical conditions "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13.

**III.    Discussion**

As an initial matter, the court grants the government's motion to file exhibits under seal. (ECF No. 783). The exhibits include defendant's private medical records, which are appropriately kept confidential and under seal.

The Bureau of Prisons ("BOP") has already reviewed and denied defendant's request for compassionate release, so the court unquestionably has jurisdiction to entertain defendant's motion. (ECF Nos. 778 at 9–10; 782 at 10). The government does not contend that defendant is a danger to the community, although it argues that the 18 U.S.C. § 3553 sentencing factors militate against release. (ECF No. 782 at 15). Thus, the main point of contention is whether there are "extraordinary and compelling reasons" to release defendant.

The government argues that defendant's "health conditions do not fall under the stand-alone medical condition category described in Application Note 1(A)." (ECF No. 782 at 12). This is true to the extent that defendant does not argue her medical conditions are terminal. *See* USSG § 1B1.13, application note 1(A)(i). The government also argues that defendant's conditions do not "substantially diminish[] [her] ability . . . to provide self-care within the environment of a correctional facility . . . ." *See id.* at note 1(A)(ii).

Defendant "has an immunologic condition of unknown etiology causing chronic idiopathic urticaria, dermographism, regular angioedema, joint pain, and rhinitis." (ECF No. 778 at 11). In her reply brief, defendant adds that "two inmates who are medical doctors and witness to [defendant's] symptoms over the last 20 months have expressed the opinion that [she] has an

James C. Mahan
U.S. District Judge

- 3 -

autoimmune disorder affecting connective tissue, likely lupus."[4] (ECF No. 785 at 7). Defendant urges that these conditions put her at grave risk of contracting coronavirus, developing COVID-19, and suffering acutely therefrom. (*See generally* ECF Nos. 778; 785).

The court is most concerned with defendant's regular angioedema and the possibility that she has lupus. The remaining conditions—chronic idiopathic urticaria ("CIU"), dermographism, joint pain, and rhinitis—are either comparatively minor or do not necessarily put her at heightened risk of COVID-19. Indeed, defendant gives her dermographism, joint pain, and rhinitis only a cursory discussion.[5] (*See* ECF No. 785). Although defendant discusses CIU, her analysis evinces that CIU itself is not a COVID-19 risk factor but may be "indicative of an autoimmune disorder," e.g., lupus, and that other circumstances and symptoms attendant to CIU are actually the risk.[6] *Id.* at 2–3. Accordingly, the court focuses its analysis on whether regular angioedema and possible lupus substantially diminishes her ability to provide self-care within the environment of a correctional facility.

Put plainly, angioedema is swelling beneath the skin. Defendant explains that angioedema "creates the risk of" and "is the precursor to" anaphylaxis. (ECF No. 785 at 4). However, the government notes that "the only entry in [defendant's] medical records regarding anaphylactic shock involves an entry documenting that a doctor discussed with [her] the 'risk and benefits and alternatives of the immunotherapy including the risk of anaphylactic shock.'" (ECF No. 782 at 14). Notably, the immunotherapy was a potential treatment for her hives, which are caused by her conditions. *Id.* at 5. Defendant's angioedema and other conditions are already being managed by

---

[4] The court notes that these purported doctors' conclusion is reasonable. Roughly 1.5 million Americans have lupus, nearly ninety percent of whom are women. National Resource Center on Lupus, *Lupus Facts and Statistics*, THE LUPUS FOUNDATION OF AMERICA, (Oct. 6, 2016), *available at* https://www.lupus.org/resources/lupus-facts-and-statistics. "Most people with lupus develop the disease between the ages of 15–44." *Id.* Symptoms include pain, "disfiguring rashes," and painful joints. *Id.* Defendant is a 42-year-old woman who developed allergy-like symptoms, rashes, and joint pain in fall 2018, when she would have been about 40 years old.

[5] Defendant goes so far as to say that allergic rhinitis is "a relatively minor condition which is not the basis for [the instant] request." (ECF No. 785 at 11).

[6] Defendant herself acknowledges that "[p]art of [her] CIU is angioedema." (ECF No. 785 at 11). This characterization further justifies the court's focus on angioedema and lupus.

**James C. Mahan**
**U.S. District Judge**

- 4 -

prescription medication.  *Id.*  That medication includes "immunosuppressant therapy (oral Prednisone) as well as multiple corticosteroid injections." (ECF No. 785 at 5).

As it stands, defendant's angioedema—although she protests to the characterization (see generally ECF No. 785)—is akin to an allergic reaction.  Defendant's angioedema would be more impactive if defendant had a concomitant cardiac or respiratory issue.  But defendant does not suggest that she has any such attendant conditions.  Thus, the court finds that defendant is capable of self-care, even while incarcerated, as it pertains to her angioedema because of her current medical treatment.

However, the same medical treatment that allows defendant to address her angioedema while incarcerated is cause for concern, particularly in conjunction with her putative lupus diagnosis.  Those with lupus during this pandemic find themselves between a rock and a hard place because "[p]eople with lupus are predisposed . . . to infections **because of their disease as well as the medications they take to manage it.**" Lupus Research Alliance, *COVID-19 Frequently Asked Questions: What You Should Know* (Apr. 3, 2020) (emphasis added).  On one hand, lupus may, if left untreated, severely damage other organs and bodily systems and, in some cases, be lethal. Sacks, J.J., et al., *Trends in deaths from systemic lupus erythematosus—United States, 1979–1998*, MMWR;51(17):371–374 (2002).[7]

On the other hand, immunosuppressant medications—like corticosteroids—are commonly used to treat lupus.  Center for Disease Control, *If You Are Immunocompromised, Protect Yourself From COVID-19,* (May 14, 2020).[8]  But "[t]he CDC recommends generally avoiding corticosteroids due to its possible prolonging of viral replication." Askanase, Khalili & Buyon, *Thoughts on COVID-19 and Autoimmune Diseases*, LUPUS SCIENCE & MEDICINE 2020;**7:**e000396, doi: 10.1136/lupus-2020-000396, (Apr. 3, 2020).[9]  The CDC includes the "[u]se of oral or intravenous corticosteroids or other medicines called immunosuppressants

---

[7] Available at https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5117a3.htm.

[8] Available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/immunocompromised.html.

[9] Available at https://lupus.bmj.com/content/7/1/e000396.

that lower the body's ability to fight some infections" as a condition or treatment that "can weaken a person's immune system (making them 'immunocompromised')." *If You Are Immunocompromised, Protect Yourself From COVID-19*; *see also* Lupus Research Alliance, *COVID-19 Frequently Asked Questions: What You Should Know* (Apr. 3, 2020) ("People taking immunosuppressive medications are considered to be immunocompromised and so could be at greater risk for infections in general."). And the CDC has specifically identified "immunocompromised" persons as an at-risk group for COVID-19. Center for Disease Control, *People Who Are at Higher Risk for Severe Illness,* (May 14, 2020).

Defendant may be able to take chloroquine or hydroxychloroquine to treat lupus without compromising her immune system. *See* Askanase, Khalili & Buyon, *Thoughts on COVID-19 and Autoimmune Diseases*, Lupus Science & Medicine 2020;**7:**e000396, doi: 10.1136/lupus-2020-000396, (Apr. 3, 2020). However, interest in hydroxychloroquine as a treatment for COVID-19 has jeopardized the availability of the drug. *See* Arthritis Foundation, *Hydroxychloroquine (Plaquenil) Shortage Causing Concern* (Mar. 24, 2020).[10] Indeed, recent reports indicate that after President Trump was prescribed and touted the effectiveness of hydroxychloroquine "[t]he renewed interest in chloroquine, an antimalarial drug available since 1944, and the similar drug hydroxychloroquine has made it difficult for pharmacies and hospital chains to manage a limited supplies." Ken Alltucker, *'Medication I Can't Live Without': Lupus Patients Struggle to Get Hydroxychoroquine, In Demand for COVID-19*, USA TODAY (Apr. 18, 2020).[11] "Orders for hydroxychloroquine spiked by 260% in the first two weeks of March compared to typical demand, according to medical consulting and data firm Premier Inc. The demand for chloroquine, another prescription drug that is similarly prescribed to treat lupus, spiked 3,000%." Samantha Raphelson

---

[10] Available at https://www.arthritis.org/drug-guide/medication-topics/plaquenil-shortage.

[11] Available at https://www.usatoday.com/story/news/health/2020/04/18/hydroxychloroquine-coronavirus-creates-shortage-lupus-drug/5129896002/.

James C. Mahan
U.S. District Judge

- 6 -

and Robin Young, *Lupus Patient Fears Greater Shortages of Hydroxycholoroquine*, WBUR (May 19, 2020).[12]

This problem is further compounded by the difficulty of seeing a physician and receiving treatment while incarcerated under the current BOP policies in response to COVID-19. Indeed, the government avers that defendant had a "target date" for a consultation with an allergist in February 2020, but that "the COVID-19 outbreak and consequential travel restrictions prevent[] [her] from receiving allergy treatment[] shots." (ECF No. 782 at 5). However, defendant contends as follows:

> The Xolair treatment first discussed with Dr. Gorenberg and noted in the record on December 4, 2018 -- nearly a year and a half ago. It was prescribed on February 13, 2019, with instruction to return within 14 days to receive the first injection. It has been delayed for over a year BEFORE the COVID pandemic. The government indicated a treatment start "target date" of February 21, 2020. For the BOP to state that "travel restrictions" related to COVID are the reason for delay is disingenuous. There was not a COVID-19 plan being implements in February 2020, or any of the preceding 12 months. A restriction on travel did not take effect until March 18, 2020, and even since, inmate movement has continued at FCC Victorville. This is just the latest excuse for administration of an expensive therapy costing $1200 per injection.

(ECF No. 785 at 5).

Even with appropriate medical attention and medication to manage lupus, defendant's best chance of avoiding COVID-19 is self-care in accordance with CDC guidelines: social distancing or isolation and hygiene. The court finds that "[t]he presence of COVID-19 . . . necessitates a more expansive interpretation of what self-care means." *United States v. Esparza*, No. 1:07-CR-00294-BLW, 2020 WL 1696084, at *3 (D. Idaho Apr. 7, 2020). In *Esparza*, the defendant seeking compassionate release was an elderly inmate who suffered from a variety of maladies that put him at increased risk of contracting COVID-19. *See generally id.* There, the court noted as follows:

> [T]he prison environment prevents [defendant] from being able to effectively self-isolate in the ways the CDC recommends for a person of his age and diminished health. In this moment, the inability for high risk individuals to fully self-isolate is an inability to provide self-care. So long as [defendant] remains in custody, his

---

[12] Available at https://www.wbur.org/hereandnow/2020/05/19/lupus-patient-hydroxycholoroquine-shortages.

James C. Mahan
U.S. District Judge

- 7 -

> capacity to protect himself from a serious, or even fatal, infection will be compromised.

*Id.*

Here, defendant urges that CDC-recommended self-care is not possible at FCI Victorville. (ECF No. 785 at 9–11). For instance, defendant avers that "[i]nmates at the camp at Victorville live in a dorm setting that houses approximately 150 women each where social distancing is impossible. [Defendant] and her neighbors' beds are separated only by a 6-inch block at bed-level which means they essentially share a bed." *Id.* at 10. Defendant also argues that her job assignment places her at risk because she returned to work on April 15, 2020, and, despite an April 14 memo from the BOP indicating that "all inmates returning to work were required to be medically screened," defendant has not been screened or examined. *Id.* at 11. Defendant "is the only inmate clerk in the outside Facilities Department and comes into regular contact with staff members from within each of the three men's facilities and vendors and contractors from outside." *Id.*

Thus, it does not appear that defendant is capable of self-care while incarcerated without more thorough medical attention, and there is a serious concern regarding whether defendant has received or will receive such attention. This inability to self-care while incarcerated, the BOP's inattentiveness to defendant's medical needs prior to COVID-19, and the problems with receiving adequate medical coverage with COVID-19 procedures in place all militate toward compassionate release under 18 U.S.C. § 3582(c)(1)(A) and USSG § 1B1.13.

The court also considers defendant's good conduct on pretrial release and while incarcerated:

> Since her indictment, MAZZARELLA has completed 2 years of law study, served on a charitable board, work consistently, volunteered, completed over 1000 hours of programming, and has served as a mentor and teacher. She has a perfect record over 12 years of government supervision -- 6 years pre-trial and 6 years incarcerated and support from a number of BOP staff members.
>
> MAZZARELLA has served 50% of the actual time she is required to serve in prison when factoring in good time but before application of pre-release custody credits under the FSA (5 years, 11 months,

**James C. Mahan**
**U.S. District Judge**

- 8 -

> 13 days as of May 15, 2020). Nearly six years in prison and another 6 under pre-trial supervision is a significant sanction. MAZZARELLA is not a danger and can contribute to society in significant ways. Her release would facilitate payment of restitution, alleviate the burden on her ill mother of raising a child, allow her to help her older children go to college, and get the medical care which has been delayed for well over a year. She would not be free while on home detention, but she would be safe.

(ECF No. 178 at 9).

Under these circumstances, the court is inclined to release defendant. However, this conclusion is predicated on an uncertain premise: whether defendant does, in fact, have lupus. In her initial motion, defendant suggested she may have lupus only in passing. (ECF No. 778 at 11 ("[Defendant] has daily traveling joint pain and a malar rash (indicative of [l]upus but unconfirmed).")). It was only in her reply brief that defendant expanded on this putative diagnosis. (*See* ECF No. 785). And defendant has neither been formally diagnosed with lupus nor did she present evidence of lupus beyond what is consistent with her other conditions. Moreover, the government did not have an opportunity to substantively respond to any of defendant's lupus-related allegations.

The court has expressed its concern about the BOP's ability to provide defendant with adequate medical care and attention while incarcerated, particularly in light of the coronavirus-related policies restricting movement. However, the court is unable to rule on the instant motion until defendant has a definitive diagnosis. Thus, the court will hold defendant's motion in abeyance and to give the BOP an opportunity to have defendant brought before a medical professional for the purpose of definitively determining whether she has lupus. If she has lupus, the BOP should determine whether it can provide defendant with chloroquine or hydroxychloroquine while incarcerated.

**IV. Conclusion**

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that defendant's motion for compassionate release (ECF No. 778) be, and the same hereby is, HELD IN ABEYANCE until July 1, 2020.

James C. Mahan
U.S. District Judge

- 9 -

IT IS FURTHER ORDERED that the government's motion to file exhibits under seal (ECF No. 783) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that the BOP shall have defendant brought before a medical doctor for the purpose of determining whether she has lupus.

IT IS FURTHER ORDERED that the government shall file a status report when defendant is brought before a medical doctor apprising the court of any diagnoses and courses of treatment.

DATED May 29, 2020.

_____
UNITED STATES DISTRICT JUDGE

**James C. Mahan**
**U.S. District Judge**